No. 23-3039

# In the United States Court of Appeals for the Sixth Circuit

THE HUNTINGTON NATIONAL BANK,
*Plaintiff-Appellant*

v.

AIG SPECIALTY INSURANCE COMPANY and NATIONAL UNION
FIRE INSURANCE COMPANY OF PITTSBURGH, PA.,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of Ohio
No. 1:20-cv-256 (Hon. James L. Graham)

## BRIEF OF APPELLEES

Devin M. Adams
ARNOLD & PORTER
  KAYE SCHOLER LLP
700 Louisiana Street, Suite 4000
Houston, TX 77002-2755
(713) 576-2444
devin.adams@arnoldporter.com

Robert Reeves Anderson
Suneeta Hazra
Rachel Ryan
ARNOLD & PORTER
  KAYE SCHOLER LLP
1144 Fifteenth Street, Suite 3100
Denver, CO 80202
(303) 863-1000
reeves.anderson@arnoldporter.com
suneeta.hazra@arnoldporter.com
rachel.ryan@arnoldporter.com

**Oral Argument Not Requested**

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Appellees submit the following statement:

AIG Specialty Insurance Company is a direct, wholly-owned (100%) subsidiary of AIG Property Casualty U.S., Inc., which is a wholly-owned (100%) subsidiary of AIG Property Casualty Inc., which is a wholly-owned (100%) subsidiary of American International Group, Inc., which is a publicly-held corporation. No parent entity or publicly held entity owns 10% or more of the stock of American International Group, Inc.

National Union Fire Insurance Company of Pittsburgh, Pa. is a direct, wholly-owned (100%) subsidiary of AIG Property Casualty U.S., Inc., which is a wholly-owned (100%) subsidiary of AIG Property Casualty Inc., which is a wholly-owned (100%) subsidiary of American International Group, Inc., which is a publicly-held corporation. No parent entity or publicly held entity owns 10% of more of the stock of American International Group, Inc.

i

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ............................................. i

TABLE OF AUTHORITIES .............................................................. iii

INTRODUCTION ............................................................................. 1

STATEMENT OF THE ISSUES ........................................................ 3

STATEMENT OF THE CASE ............................................................ 3

    A.    Factual Background ........................................................ 3

        1.    The Ponzi Scheme ............................................. 3

        2.    The Bankruptcy Proceedings .......................... 6

        3.    The Sixth Circuit's Opinion ........................... 8

    B.    Policy Provisions ......................................................... 11

    C.    Procedural History ..................................................... 13

SUMMARY OF ARGUMENT .......................................................... 17

STANDARD OF REVIEW ............................................................... 20

ARGUMENT .................................................................................. 21

I.    Huntington's Return of Fraudulently Transferred Ponzi-Scheme Funds Is "Uninsurable" ............................................. 21

    A.    Disgorgement of wrongfully acquired funds is not an insurable loss ............................................................... 21

    B.    Huntington's contrary arguments are meritless ............... 29

II.    Huntington's Settlement Is Independently Excluded from Coverage as an "Unrecoverable or Outstanding Credit" .............. 45

III.    The "Larger Settlement Rule" Does Not Apply ............................ 53

CONCLUSION ............................................................................... 58

COMBINED CERTIFICATIONS ....................................................... 59

ADDENDUM ................................................................................. 60

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*AKC, Inc. v. United Specialty Ins. Co.*,
    187 N.E.3d 501 (Ohio 2021) ................................................................. 37

*Alanco Techs., Inc. v. Carolina Cas. Ins. Co.*,
    No. CV-04-789, 2006 WL 1371633 (D. Ariz. May 17, 2006) .............. 23

*Andersen v. Highland House Co.*,
    757 N.E.2d 329 (Ohio 2001) ................................................................. 36

*Astellas US Holding, Inc. v. Fed. Ins. Co.*,
    No. 21-3075, 2023 WL 3221737 (7th Cir. May 3, 2023) .............. 30, 31

*Bank of the W. v. Superior Court*,
    833 P.2d 545 (Cal. 1992) ........................................................... 2, 22, 23

*Beverage Holdings, L.L.C. v. 5701 Lombardo, L.L.C.*,
    150 N.E.3d 28 (Ohio 2019) ................................................................... 53

*Big 5 Corp. v. Gulf Underwriters Ins. Co.*,
    No. CV-02-3320, 2003 WL 22127029 (C.D. Cal. July 14, 2003) ......... 23

*Burks v. XL Specialty Ins. Co.*,
    534 S.W.3d 458 (Tex. App. 2015) .................................................. 31, 32

*In re C.M. Meiers Co., Inc.*,
    No. 1:12-BK-10229, 2016 WL 9458553 (Bankr. C.D. Cal.
    Dec. 20, 2016) ....................................................................................... 55

*Call One Inc. v. Berkley Ins. Co.*,
    587 F. Supp. 3d 706 (N.D. Ill. 2022) .............................................. 32, 33

*Caterpillar, Inc. v. Great Am. Ins. Co.*,
    62 F.3d 955 (7th Cir. 1995) ................................................................... 55

*Conseco, Inc. v. Nat'l Union Fire Ins. Co.*,
    2002 WL 31961447 (Ind. Cir. Dec. 31, 2002) ..................................... 40

iii

*Dana Inc. v. Zurich Am. Ins. Co.*,
    No. 21-4150, 2022 WL 2452381 (6th Cir. July 6, 2022) ..................... 36

*Duncan v. Muzyn*,
    885 F.3d 422 (6th Cir. 2018)............................................................. 49

*Eastham v. Chesapeake Appalachia, L.L.C.*,
    754 F.3d 356 (6th Cir. 2014)........................................................ 49, 50

*Fireman's Fund Ins. Co. v. Mitchell-Peterson, Inc.*,
    578 N.E.2d 851 (Ohio Ct. App. 1989) ................................................ 24

*IRS v. Nordic Village, Inc.*,
    915 F.2d 1049 (6th Cir. 1990)............................................................ 47

*J.P. Morgan Sec. Inc. v. Vigilant Ins. Co.*,
    183 N.E.3d 443 (N.Y. 2021) ........................................................ 34, 35

*Jennings v. Stephens*,
    574 U.S. 271 (2015) .......................................................................... 43

*Karabin v. State Auto. Mut. Ins. Co.*,
    462 N.E.2d 403 (Ohio 1984).............................................................. 20

*Kungle v. Equitable Gen. Ins. Co.*,
    500 N.E.2d 343 (Ohio 1985).............................................................. 25

*Level 3 Commc'ns, Inc. v. Fed. Ins. Co.*,
    272 F.3d 908 (7th Cir. 2001)..................................................... *passim*

*Local 705 Int'l Bhd. of Teamsters Health & Welfare Fund v. Five
    Star Managers, L.L.C.*, 735 N.E.2d 679 (Ill. App. 2000) ................... 22

*Meoli v. The Huntington Nat'l Bank*,
    848 F.3d 716 (6th Cir. 2017)..................................................... *passim*

*Meoli v. The Huntington Nat'l Bank (In re Teleservices Grp., Inc.)*,
    444 B.R. 767 (Bankr. W.D. Mich. 2011).................................... *passim*

*Meoli v. Huntington Nat'l Bank*,
    No. 1:12-CV-1113, 2015 WL 5690953 (W.D. Mich. Sept. 28, 2015).....8

iv

*Millennium Partners, L.P. v. Select Ins. Co.*,
  882 N.Y.S.2d 849 (N.Y. Sup. Ct. 2009) ........................................ 22, 23

*Mission Prod. Holdings, Inc. v. Tempnology, LLC*,
  139 S. Ct. 1652 (2019) .................................................................. 47

*Motorists Mut. Ins. Co. v. Ironics, Inc.*,
  200 N.E.3d 149 (Ohio 2022) .......................................................... 49

*Nat'l Union Fire Ins. Co. v. Am. Motorists Ins. Co.*,
  707 F.3d 797 (7th Cir. 2013) ...................................................... 54, 55

*Owens Corning v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*,
  257 F.3d 484 (6th Cir. 2001) ................................................ 19, 54, 55

*Phila. Indem. Ins. Co. v. Sabal Ins. Grp., Inc.*,
  786 F. App'x 167 (11th Cir. 2019) .................................................. 22

*Phillips v. Cincinnati Ins. Co.*,
  398 N.E.2d 564 (Ohio 1979) ........................................................... 25

*Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*,
  95 F. App'x 132 (6th Cir. 2004) ..................................................... 36

*Reliance Grp. Holdings, Inc. v. Nat'l Union Fire Ins. Co. of
  Pittsburgh, Pa.*, 594 N.Y.S.2d 20 (N.Y. App. Div. 1993) ................... 23

*Roberts v. State Farm Mut. Auto. Ins. Co.*,
  802 N.E.2d 157 (Ohio Ct. App. 2003) .............................................. 24

*RSUI Indem. Co. v. Murdock*,
  248 A.3d 887 (Del. 2021) ............................................................... 30

*Ryerson Inc. v. Fed. Ins. Co.*,
  676 F.3d 610 (7th Cir. 2012) ............................................... 25, 39, 44

*Sauer v. Crews*,
  18 N.E.3d 410 (Ohio. 2014) ........................................................... 48

*Savedoff v. Access Grp., Inc.*,
  524 F.3d 754 (6th Cir. 2008) .................................................... 50, 53

*Simms v. Bayer Healthcare LLC,*
    752 F.3d 1065 (6th Cir. 2014) ............................................................ 29

*St. Marys Foundry, Inc. v. Emps. Ins. of Wausau,*
    332 F.3d 989 (6th Cir. 2003) ................................................................ 36

*State Auto. Mut. Ins. Co. v. Fairfield Homes, Inc.,*
    No. 11-CA-89, 1989 WL 139822 (Ohio Ct. App. Nov. 14, 1989) ......... 43

*Strategic Cap. Bancorp, Inc. v. St. Paul Mercury Ins. Co.,*
    No. 10-CV-2062, 2015 WL 13598261 (C.D. Ill. Sept. 25, 2015) ......... 35

*Sunoco, Inc. (R&M) v. Toledo Edison Co.,*
    953 N.E.2d 285 (Ohio 2011) ................................................................ 38

*Sycamore Partners Mgmt., L.P. v. Endurance Am. Ins. Co.,*
    No. 18C-09-211, 2021 WL 761639 (Del. Super. Ct. Feb. 26, 2021) .... 30

*The Corinthian v. Hartford Fire Ins. Co.,*
    758 N.E.2d 218 (Ohio Ct. App. 2001) .......................................... 38, 39

*In re TIAA-CREF Ins. Appeals,*
    192 A.3d 554, 2018 WL 3620873 (Del. 2018) ............................... 33, 34

*In re TransTexas Gas Corp.,*
    597 F.3d 298 (5th Cir. 2010) ..................................................... *passim*

*U.S. Bank Nat'l Ass'n v. Indian Harbor Ins. Co.,*
    No. 12-cv-3175, 2014 WL 3012969 (D. Minn. July 3, 2014) .............. 30

*U.S. Fid. & Guar. Co. v. Fendi Adele S.R.L.,*
    823 F.3d 146 (2d Cir. 2016) ................................................................ 23

*Unified W. Grocers, Inc. v. Twin City Fire Ins. Co.,*
    457 F.3d 1106 (9th Cir. 2006) ............................................................ 22

*United Specialty Ins. Co. v. Cole's Place, Inc.,*
    936 F.3d 386 (6th Cir. 2019) .............................................................. 20

*Westfield Nat'l Ins. Co. v. Quest Pharms., Inc.,*
    57 F.4th 558 (6th Cir. 2023) ............................................................... 20

*Will Repair, Inc. v. Grange Ins. Co.*,
  15 N.E.3d 386 (Ohio Ct. App. 2014) .................................................... 43

*William Beaumont Hosp. v. Federal Insurance Company*,
  552 F. App'x 494 (6th Cir. 2014) .................................................. 26, 41

*Wohl v. Swinney*,
  888 N.E.2d 1062 (Ohio 2008) .............................................................. 48

## Statutes

11 U.S.C. § 548 ..................................................... 1, 7, 27, 31, 41

11 U.S.C. § 550 ............................................................ 1, 7, 31, 41

## Other Authorities

Allan D. Windt, *Insurance Claims and Disputes* (6th ed. 2023) ............ 24

*Couch on Insurance* (3d ed. 2022) ...................................................... 25, 46

## INTRODUCTION

In 2017, this Court held that appellant Huntington National Bank was liable for its role in a Ponzi scheme that one of its customers conducted, causing creditors to suffer significant losses when the customer went bankrupt. *Meoli v. The Huntington Nat'l Bank*, 848 F.3d 716 (6th Cir. 2017). As the Court explained in that underlying action, Huntington continued to accept millions of dollars in loan payments from the Ponzi schemer months after learning disturbing facts about the customer that ended the bank's "good faith" in receiving such payments. Those funds, the Court concluded, constituted fraudulent transfers under Sections 548 and 550 of the Bankruptcy Code that had to be returned to the bankruptcy estate. On remand, Huntington settled the bankruptcy Trustee's claims for $32 million, disgorging the unlawful loan payments and the accompanying accrued interest.

Huntington now asks this Court to order its insurance companies to cover the bank's purported "loss" in returning those ill-gotten gains to the customer's bankruptcy estate. But as the district court rightly concluded in granting summary judgment for appellees, Huntington suffered no insurable loss when it returned funds it was never lawfully

entitled to receive in the first place. This conclusion follows from the Policy's unambiguous text that "Loss" "shall not include matters deemed uninsurable under the law," and the consensus of authority holding that public policy precludes insurance for the disgorgement of wrongfully acquired funds. Accepting Huntington's contrary position would "permit the wrongdoer to transfer the cost of disgorgement to an insurer [and] would eliminate the incentive for obeying the law." *Bank of the W. v. Superior Court*, 833 P.2d 545, 555 (Cal. 1992). The district court further held that the Policy's exclusion relating to "unrepaid, unrecoverable or outstanding credit" was an independent and alternative ground requiring summary judgment for the insurers.

In challenging the district court's opinion, Huntington relies on inapposite authority, mischaracterizes governing Ohio law, ignores key policy language in an attempt to manufacture ambiguity, and downplays its own adjudicated culpability that led to its restitution settlement. Huntington fails to identify error in either of the district court's independent grounds for summary judgment below, much less run the table as required to prevail on appeal. This Court should affirm.

2

## STATEMENT OF THE ISSUES

1.    Whether the district court correctly held that an insured's disgorgement of wrongfully acquired funds constituting fraudulent transfers is uninsurable under Ohio law.

2.    Whether, as an independent basis for the judgment below, the district court correctly held that Huntington's settlement of fraudulent transfer allegations arising from unlawful loan payments fell within the Policy's exclusion for "unrepaid, unrecoverable or outstanding credit."

3.    Whether the district court correctly held that the larger settlement rule does not apply to the facts of this case and would not change the outcome in any event.

## STATEMENT OF THE CASE

### A.    Factual Background

#### 1.    *The Ponzi Scheme*

This Court's order in the underlying bankruptcy action lays out the relevant factual background. *Meoli*, 848 F.3d at 719–24. The key facts are briefly recounted here for context.

Over several years in the early 2000s, Barton Watson used his two affiliated companies, Teleservices Group, Inc. and Cyberco Holdings, Inc., to carry out a Ponzi scheme that defrauded creditors out of hundreds

of millions of dollars. During that period, Cyberco used Huntington as its primary bank. To perpetuate the scheme, Watson and his accomplices sought out banks, leasing companies, and other financial institutions who were told that Cyberco needed money in order to purchase computer equipment for its growing business, and that the equipment would be purchased from a third-party vendor called Teleservices. *Id.* at 720–21.

In reality, Teleservices was a paper company that Watson had created solely to facilitate the fraud. *Id.* at 720. Watson and his accomplices would fabricate Teleservices invoices documenting the purchase of the computer equipment and instruct the finance companies to send payment directly to Teleservices. *Id.* Once the finance companies paid Teleservices, Watson moved the funds from Teleservices' bank account to Cyberco's account at Huntington. *Id.* Cyberco generally did not acquire the equipment for which it had received funding from the financing companies. *Id.* Instead, Watson used that money to pay his and others' salaries and to pay Cyberco's earlier debts to financing companies for previous "purchases." *Id.*

Over the course of their banking relationship, which began in 2002, Huntington loaned Cyberco millions of dollars, primarily through a

4

revolving line of credit. *Meoli v. The Huntington Nat'l Bank (In re Teleservices Grp., Inc.)*, 444 B.R. 767, 775 (Bankr. W.D. Mich. 2011). Throughout the fraud, Huntington was receiving money directly from Teleservices and applying that money to pay down the balance on Cyberco's loan from Huntington. *Id.* at 783–84. Starting at least as early as 2003, Huntington encountered numerous "red flags" in its banking relationship with Cyberco and Teleservices, including Watson's refusal to comply with key provisions of the loan agreement, such as audit reviews. *Id.* at 818–19.

By 2004, Cyberco's revolving loan balance with Huntington had grown to $16 million. Huntington was "facing a difficult and expensive recovery from a customer that it now knew was under an active criminal investigation." *Id.* at 821. "Huntington, without question, wanted its money back and, as [one Huntington senior executive] repeatedly testified, it really didn't matter to Huntington how Cyberco went about doing it." *Id.* Despite the mounting evidence of Cyberco's fraud, Huntington granted it multiple extensions of credit, allowing Cyberco the time it needed to pay its debt to Huntington by the end of October 2004. *Id.* at 783–84.

In November 2004, the FBI raided Cyberco's offices; Watson committed suicide shortly thereafter. *Id.* at 784 & n.62. It became public that Cyberco and Teleservices were part of a multi-million dollar Ponzi scheme, in which various financing companies were the victims. *Id.* at 784. But unlike Cyberco's other creditors, Huntington had been paid back on its loans to Cyberco. *See id.*

### 2. *The Bankruptcy Proceedings*

Creditors filed an involuntary bankruptcy action against Cyberco in December 2004, Teleservices filed for bankruptcy in January 2005, and a Trustee was appointed for both companies. *Meoli*, 848 F.3d at 722; *Meoli*, 444 B.R. at 787 n.75. On behalf of each estate, the Trustee filed adversary proceedings against Huntington to recover amounts that the Trustee alleged were fraudulently transferred to Huntington. Op., R. 84, PageID# 5751 (citing Cyberco Compl., R. 18-1; Teleservices Compl., R. 18-2). The Trustee alleged that Huntington's continued extension of credit to Cyberco allowed Huntington the time needed to "successfully pressure[] Cyberco to completely pay off the entire debt" while also providing Watson and his co-conspirators with "continued funding to shift the Ponzi scheme into high gear, bringing in more and more victims

6

to keep the Cyberco boat afloat." Cyberco Compl., R. 18-1, PageID# 209. The estates later agreed to proceed jointly under one action against Huntington. Op., R. 84, PageID# 5751.

The Trustee sought to recover from Huntington "three types of transfers": (1) "direct loan repayments"—Teleservices' direct payments to Huntington to pay Cyberco's debt to Huntington; (2) "indirect loan repayments"—funds "Teleservices sent to Cyberco's deposit account at Huntington, and which Cyberco later used to repay its debt to Huntington"; and (3) "excess deposits"—funds "Teleservices sent to Cyberco's deposit account at Huntington, and which Cyberco later withdrew or the government later seized." *Meoli*, 848 F.3d at 719.[1]

---

[1] The Bankruptcy Code authorizes a trustee to "avoid any transfer" of the debtor's property that the debtor "voluntarily or involuntarily" made "within 2 years" of filing for bankruptcy and "with actual intent to hinder, delay, or defraud any entity to which the debtor was … indebted." 11 U.S.C. § 548(a)(1)(A). If such a transfer was made, "the trustee may recover, for the benefit of the estate, the property transferred or … the value of such property, from … the initial transferee of such transfer … or any immediate or mediate [i.e., subsequent] transferee of such initial transferee." 11 U.S.C. § 550(a). An initial transferee can nevertheless retain the transfer if it can establish that it: "(i) took the property 'in good faith'; and (ii) 'gave value to the debtor in exchange for such transfer.'" *Meoli*, 848 F.3d at 729 (quoting 11 U.S.C. § 548(c)). "A subsequent transferee" must show those same elements and that it took the property "without knowledge of the voidability of the transfer avoided." *Id.* at 730 (quoting 11 U.S.C. § 550(b)(1)).

7

"The bankruptcy court conducted two trials and issued multiple opinions." *Id.* at 722. It concluded that the Trustee could recover from Huntington "$72 million in loan repayments and excess deposits," plus prejudgment interest. *Id.* at 722–24. Based on a subjective test of Huntington's honesty and integrity, the court held that Huntington failed to establish its good faith in connection with its receipt of transfers from Cyberco and Teleservices. *Meoli*, 444 B.R. at 816, 843. The district court adopted the bankruptcy court's report and recommendation. *Meoli*, 848 F.3d at 724; *see also Meoli v. Huntington Nat'l Bank*, No. 1:12-CV-1113, 2015 WL 5690953 (W.D. Mich. Sept. 28, 2015).

### 3. *The Sixth Circuit's Opinion*

This Court affirmed in part. The Court agreed with the district court as a factual matter that "Huntington's proven good faith ended on April 30, 2004" when Huntington's investigator discovered Watson's fraudulent past but failed to disclose it to the manager who oversaw Huntington's relationship with Cyberco. *Meoli*, 848 F.3d at 730. By that point, the manager for the Cyberco account "had already discovered that Watson had lied about Cyberco's customers, had already spotted many 'red flags' in Cyberco's financials, and had worried that Huntington may

8

'lose money' because of Cyberco." *Id.* at 730–31 (internal citations omitted). This Court concluded that the investigator's failure to communicate the additional evidence of fraud "was critical" and that "corporate bad faith [was] embedded in that breakdown in communication." *Id.* at 730–31.

Having rejected Huntington's "good faith" defense, the Court affirmed the Trustee's right to "recover all subsequent loan repayments [after April 30, 2004], which include some of the indirect loan repayments and all the direct loan repayments." *Id*. The Court held that the Trustee also could seek to "recover [the] indirect loan repayments made between ... September 25, 2003, and April 30, 2004," but "only if the [district] court conclude[d] on remand that Huntington's proven lack of knowledge of the voidability of the transfers ceased during that period." *Id*.

The Court reversed the district court's holding that Cyberco's excess deposits, which it defined as "those deposits not applied to pay back debts to Huntington," were recoverable from Huntington. *Id*. at 724–25. The Court explained that Huntington had not acquired the requisite "dominion and control" over those assets to become a transferee under the Bankruptcy Code. *Id*. Lastly, the Court invited the district court to

9

"choose a different prejudgment interest rate" on remand to account for the fact that "Huntington may have profited more during th[e] litigation than it will be ordered to pay under the statutory rate." *Id.* at 736.

On remand, Huntington argued that its liability was limited to "$12,821,897.07 (plus interest)," which it characterized as "the total amount of direct and indirect repayments Huntington received after April 30, 2004." Huntington Br., R. 70-1, PageID# 2571. The Trustee argued that Huntington was liable for "the total of all loan repayments to Huntington from Cyberco and Teleservices during the period after November 16, 2003 ... nearly $36 million," plus interest. Tr. Br., R. 70-2, PageID# 2640; *see also id.*, PageID# 2613, 2631–32; Ex. 1, R. 572-1, PageID# 2, *Meoli v. Huntington Nat'l Bank*, No. 7-80037 (W.D. Mich. Aug. 25, 2017). This amount was higher than the loan's highest running balance of $17 million because "Huntington from time to time chose to advance new funds to Cyberco after some amounts had been repaid." Tr. Br., R. 70-2, PageID# 2640.

Huntington settled with the Trustee for $32 million in March 2018. Compl., R. 1, PageID# 10.

10

**B.     Policy Provisions**

For the period January 1, 2007, to January 1, 2008, AIG Specialty Insurance Company issued to Huntington a banker's professional liability policy (the "Policy"), R. 70-6, PageID# 2811, and National Union Fire Insurance Company of Pittsburgh, Pa., issued to Huntington a second-layer excess policy ("Excess Policy"), R. 70-7, PageID# 2865–66.[2] The Policy includes a $10 million retention, above which liability is capped at $15 million in the aggregate or $5 million for "Lender's Liability" under Endorsement 7. R. 70-6, PageID# 2811, 2839. The Excess Policy covers $10 million in excess of the total underlying policy limits. R. 70-7, PageID# 2866. The Excess Policy is governed by "the same terms, conditions, exclusions, and limitations of [the Policy]." Excess Policy, R. 70-7, PageID# 2869.  As such, citations in this brief to the "Policy" refer to both policies unless otherwise noted.

The Policy provides that Insurers will "pay the Loss of the Insured arising from a Claim first made against the Insured … for any actual or alleged Wrongful Act of any Insured in the rendering or failure to render Professional Services," subject to certain conditions and restrictions.

---

[2] The appellees are collectively referred to as "Insurers."

11

Policy § 1, R. 70-6, PageID# 2813. "Wrongful Act" is defined as "any act, error or omission in the rendering of or failure to render Professional Services." Policy § 2(k), R. 70-6, PageID# 2815.

Numerous Policy provisions were at issue in the summary judgment briefing below, but only two remain relevant to the issues raised in this appeal. First, the Policy defines "Loss," in relevant part, as "damages, judgments, settlements and Defense Costs, and any payment made by the Insurer," but then provides that "Loss shall not include … matters that may be deemed uninsurable under the law pursuant to which this policy shall be construed"—which in this case is Ohio law. Policy § 2(g)(iv), R. 70-6, PageID# 2814; Op., R. 84, PageID# 5758. Endorsement 8, which modifies the definition of Loss in certain respects, does not change the language quoted above. *See* Endorsement 8, R. 70-6, PageID# 2840.

The second relevant provision is Endorsement 7, which provides "exclusions" applicable to "any Insured's performance of Lending Acts" that might otherwise fall within the insuring agreement. Endorsement 7, R. 70-6, PageID# 2838. "Lending Act" is defined as "any act performed by an Insured for … a customer or client of the Company relating to an

12

extension of credit, a refusal to extend credit or an agreement to extend credit." *Id.*, PageID# 2837. Endorsement 7 excludes coverage for "Loss in connection with any Claim or Claims made against any insured … for the principal and/or interest of any unrepaid, unrecoverable or outstanding credit." *Id.*, PageID# 2838.

### C.    Procedural History

In March 2007, Huntington asked AIG Specialty to conduct a "review and coverage analysis" under the Policy regarding the Trustee's allegations. R. 18-3, PageID# 273. AIG Specialty responded in April 2007 with an analysis of the applicable provisions and exclusions of the Policy, concluding that there was no coverage "because the claim seeks the disgorgement of monies paid by Cyberco to the insured to pay down its loan balance" and because an exclusion in Endorsement 7 to the Policy "sets forth that the Insurer shall not be liable to make any payment for Loss in connection with any Claim or Claims made against any Insured: for the principal and/or interest of any unrepaid, unrecoverable or outstanding credit," among other grounds. R. 1-3, PageID# 100. Huntington renewed its request for a "coverage analysis" in April 2013

13

and July 2018, and both times AIG Specialty reiterated its prior coverage conclusions and denied coverage. *See id.*, PageID# 102–112.

Almost two years after settling with the Trustee, Huntington filed this action in January 2020 alleging breach of contract and bad faith. Compl., R. 1. Huntington sought to recoup its defense costs incurred in the bankruptcy proceeding and a portion of the $32 million settlement, *id.*, PageID# 6–16, for a total amount "in excess of $17,000,000," *id.*, PageID # 17. This amount appears to be composed of the entire $15 million limit of the Primary Policy and roughly $2 million from the Excess Policy.[3]

After discovery and extensive briefing on cross-motions for summary judgment, the district court granted summary judgment in favor of Insurers. Op., R. 84, PageID# 5766. The court began by analyzing whether Huntington's defense and settlement of the Adversary

---

[3] Under the Policy, Huntington must absorb the first $10 million of loss as retention. After the $15 million aggregate limit is exhausted under the Primary Policy, the next $15 million comes from Huntington's first excess policy issued by St. Paul Mercury Insurance Company (a Travelers company), which is not a party to this case. Huntington failed to notify Travelers of the claim until 2013, and Travelers denied coverage on the basis of untimely notice. R. 70-11, PageID# 2977–81; R. 70-12, PageID# 2986–89. Huntington must absorb Traveler's $15 million share before seeking additional coverage under National Union's Excess Policy.

14

Proceeding constitute an "uninsurable loss" as a matter of law. *Id.*, PageID# 5758–64. The court found that "no Ohio court has addressed whether disgorgement is insurable," so the judge surveyed the key decisions from state and federal courts to predict how the Ohio Supreme Court would decide the issue. *Id.*, PageID# 5759–62. Based on persuasive and near-uniform authority holding that "disgorgement of ill-gotten gains" is uninsurable, *id.*, PageID# 5761 (quoting *In re TransTexas Gas Corp.*, 597 F.3d 298, 310 (5th Cir. 2010)), the district court concluded that "Ohio courts are unlikely to permit insurance coverage for wrongfully obtained money." *Id*. Thus, the court found that "Huntington's acceptance of loan payments without good faith constitutes the wrongful taking of money and is uninsurable" as a matter of law, *id.*, PageID# 5762. For the same reason, the court concluded that prejudgment interest also constitutes "uninsurable disgorgement" because such interest accounts for the "profit" Huntington may have gained from "investing the illegal transfers." *Id.*, PageID# 5764.

The court then held that Huntington's demand for coverage is independently barred by Endorsement 7's exclusion of "Loss in connection with any Claim" relating to "the principal and/or interest of

15

any unrepaid, unrecoverable or outstanding credit." *Id.* (quoting Endorsement 7, R. 70-6, PageID# 2838). The court rejected Huntington's argument that it was not engaged in "Lending Acts," finding instead that Huntington's acts easily satisfied the definition of Lending Acts because "Huntington extended to Cyberco … a line of credit," and then it "accepted payments … to pay down that line of credit." *Id.*, PageID# 5765. Because Huntington's "insurance claim was, in reality, an attempt to reobtain the loan payments it was forced to return" in the bankruptcy settlement and because such credit is "uncollectable" now that Cyberco is bankrupt, the court held that Huntington was seeking coverage for "outstanding and unrecoverable credit," and thus coverage is excluded under Endorsement 7. *Id.*, PageID# 5765–66.

In addition to holding that the Trustee's lawsuit to recover fraudulent transfers was neither insurable under the law nor insured by the Policy, the district court also rejected Huntington's argument that there is a presumption of coverage for the entire settlement amount of the $32 million because *part* of the settlement *might* be insurable. *Id.*, PageID# 5762–63. As the court explained, the subject of the settlement was the Adversary Proceeding for "the recovery of illegal transfers," and

therefore "none of Huntington's settlement is covered by the Primary Policy." *Id.*, PageID# 5763. The court dismissed as "patently false" Huntington's contention that the settlement might have included "potentially insurable open issues on remand." *Id*. The court declined to expand the "larger settlement rule" based upon Huntington's purported "motivation for the settlement," e.g., "publicity, litigation costs, and resource management." *Id.*, PageID# 5762, 5764.

Lastly, "Huntington's bad faith cause of action fail[ed] as a matter of law" because the claim was "based on the same allegations as its breach of contract claim and … no breach occurred." *Id.*, PageID# 5766.[4]

## SUMMARY OF ARGUMENT

The district court correctly granted summary judgment in favor of Insurers because the Policy does not insure Huntington's settlement and costs incurred in the Adversary Proceeding.

---

[4] The district court did not reach Insurers' additional grounds for summary judgment based on (1) an exclusion in Endorsement 10 for a Claim arising out of Huntington's gain of any profit to which a judgment established Huntington was not legally entitled, and (2) an exclusion in Endorsement 5 for a Claim involving loans owned by Huntington for more than 12 months. Br., R. 70, PageID# 2551–55, 2557–59. Insurers also argued below at summary judgment that even if there was coverage, the Adversary Proceeding triggers Endorsement 7's $5 million limit of liability. Br., R. 70, PageID# 2559–61.

17

I.    Huntington's return of fraudulently transferred funds to the bankruptcy estate is not an insurable loss. The Policy's definition of "Loss" explicitly does "not include matters which may be deemed uninsurable under the law." Courts around the country have held that public policy precludes insuring an insured's disgorgement of ill-gotten gains, including in the specific context of disgorgement of fraudulent transfers under the Bankruptcy Code. *See, e.g.*, *In re TransTexas Gas Corp.*, 597 F.3d 298, 309–10 (5th Cir. 2010). This consensus of authority reflects a well-established principle in insurance law that when an insured returns property that it was never legally entitled to acquire, there is no insurable loss. The district court did not err in predicting that Ohio courts would adopt this principle as public policy.

Huntington's contrary arguments fail. The question on appeal is about the content of Ohio law—not the interpretation of specific Policy text—rendering canons of *contra proferentem* inapplicable. The key contractual phrase ("uninsurable under the law") is unambiguous, as numerous courts have held. As to whether Huntington's return of fraudulently transferred funds is uninsurable under the law, each of the relevant authorities upon which Huntington relies supports the district

18

court's holding that Huntington is not insured for its disgorgement of wrongfully acquired funds. Contrary to Huntington's protestations, the district court did not "flip the burden" onto Huntington to disprove insurability. The district court explicitly (albeit incorrectly) put the burden on Insurers, and Huntington identifies nothing in the decision below to conclude otherwise.

II.    The Policy's Endorsement 7 independently excludes coverage. The bankruptcy settlement constitutes a payment "in connection with" a claim against Huntington "for the principal and/or interest of any unrepaid, unrecoverable or outstanding credit," which expressly is excluded from coverage. Huntington's argument that this exclusion does not apply to any servicing activity in connection with active loans is unmoored to the text. When this Court in *Meoli* affirmed the Trustee's right to unwind the fraudulent loan payments and return the parties to the *status quo ante*, Huntington's settlement of the lawsuit undeniably arose "in connection with" an "unrecoverable or outstanding credit."

III.    Finally, the "larger settlement rule" announced in *Owens Corning v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 257 F.3d 484 (6th Cir. 2001), does not apply. Huntington has not and cannot show that its

19

settlement included the resolution of *any* covered claim. The district court correctly rejected Huntington's counterfactual speculation as "patently false."

## STANDARD OF REVIEW

This Court reviews summary judgment decisions *de novo*, applying the same Rule 56 standard as the district court. *Westfield Nat'l Ins. Co. v. Quest Pharms., Inc.*, 57 F.4th 558, 561 (6th Cir. 2023). The Court also "review[s] de novo a district court's decision on the interpretation of an insurance contract." *Id*. Interpreting the contract requires this Court to apply Ohio law in accordance with the controlling decisions of the Supreme Court of Ohio. *United Specialty Ins. Co. v. Cole's Place, Inc.*, 936 F.3d 386, 402 (6th Cir. 2019). "If the state supreme court has not yet addressed the issue presented, [this Court] must predict how the court would rule by looking to all the available data." *Id*. (quoting *Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001)). "[W]hen the language of an insurance policy has a plain and ordinary meaning, it is unnecessary and impermissible for a court to resort to construction of that language." *Karabin v. State Auto. Mut. Ins. Co.*, 462 N.E.2d 403, 406 (Ohio 1984).

## ARGUMENT

### I. Huntington's Return of Fraudulently Transferred Ponzi-Scheme Funds Is "Uninsurable"

The district court correctly held that Insurers did not breach their insurance contracts because Huntington's return of fraudulently transferred funds in the bankruptcy action is uninsurable as a matter of law and therefore does not constitute a "Loss" under the Policy. The district court's well-reasoned conclusion was compelled by the Policy's unambiguous text and aligns with the broad consensus of courts around the country.

#### A. Disgorgement of wrongfully acquired funds is not an insurable loss

The Policy provides coverage only for a "Loss," which is defined in relevant part to include "judgments, settlements and Defense Costs" but expressly does "not include … matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed." Policy § 2(g)(iv) (as amended by Endorsement 8), R. 70-6, PageID# 2814, 2840. This definition reflects the well-established principle in insurance law that when an insured returns property that it was never legally entitled to acquire, the insured has not sustained a "loss" within the meaning of an insurance policy. *See, e.g.*, *Level 3 Commc'ns, Inc. v. Fed. Ins. Co.*, 272

21

F.3d 908, 910 (7th Cir. 2001) ("a 'loss' within the meaning of an insurance contract does not include the restoration of an ill-gotten gain"); *Phila. Indem. Ins. Co. v. Sabal Ins. Grp., Inc.*, 786 F. App'x 167, 173 (11th Cir. 2019) ("as a matter of Florida law, insurance contracts do not insure the restitution of ill-gotten gains"); *Unified W. Grocers, Inc. v. Twin City Fire Ins. Co.*, 457 F.3d 1106, 1115 (9th Cir. 2006) ("California case law precludes indemnification and reimbursement of claims that seek the restitution of an ill-gotten gain."); *Bank of the W. v. Superior Court*, 833 P.2d 545, 553–55 (Cal. 1992) (collecting cases) ("It is well established that one may not insure against the risk of being ordered to return money or property that has been wrongfully acquired."); *Millennium Partners, L.P. v. Select Ins. Co.*, 882 N.Y.S.2d 849, 853 (N.Y. Sup. Ct. 2009) (collecting cases) ("[D]isgorgement of 'ill-gotten funds is not insurable under the law' because such disgorgement 'does not constitute "damages" or a "loss" as those terms are used in insurance policies.'").[5] An insurance policy cannot be purchased to insure against future disgorgement.

---

[5] *See also Local 705 Int'l Bhd. of Teamsters Health & Welfare Fund v. Five Star Managers, L.L.C.,* 735 N.E.2d 679, 682–84 (Ill. App. 2000) (collecting cases) (restitution payment not covered because an insured "simply cannot lose that to which it was not legally entitled"; restitution

Footnote continued on next page

As the California Supreme Court explained three decades ago:

> The public policy rationale that underlies these holdings, explicitly or implicitly, is this: When the law requires a wrongdoer to disgorge money or property acquired through a violation of the law, to permit the wrongdoer to transfer the cost of disgorgement to an insurer would eliminate the incentive for obeying the law. Otherwise, the wrongdoer would retain the proceeds of his illegal acts, merely shifting his loss to an insurer.

*Bank of the W.*, 833 P.2d at 555.

---

payments are "uninsurable"); *Reliance Grp. Holdings, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 594 N.Y.S.2d 20, 24 (N.Y. App. Div. 1993) ("one may not insure against the risk of being ordered to return money or property that has been wrongfully acquired"); *U.S. Fid. & Guar. Co. v. Fendi Adele S.R.L.*, 823 F.3d 146, 152 (2d Cir. 2016) ("The risk of being directed to return improperly acquired funds is not insurable. Restitution of ill-gotten gains does not constitute 'damages' or a 'loss' as those terms are used in insurance policies.") (quoting *Vigilant Ins. Co. v. Credit Suisse First Boston Corp.*, 10 A.D.3d 528, 528 (N.Y. App. Div. 2004), and citing *XL Specialty Ins. Co. v. Loral Space & Commc'ns, Inc.*, 82 A.D.3d 108, 115 (N.Y. App. Div. 2011)). Costs incurred to defend actions that result in the disgorgement of improperly acquired funds are also not covered by the insurance policy. *Millennium Partners*, 882 N.Y.S.2d at 853; *Alanco Techs., Inc. v. Carolina Cas. Ins. Co.*, Case No. CV-04-789, 2006 WL 1371633, at *4 (D. Ariz. May 17, 2006) ("Because rescissory damages are uninsurable under the law, and defense costs are recoverable only for covered losses, Plaintiffs suffered no loss under the policy."); *Big 5 Corp. v. Gulf Underwriters Ins. Co.*, Case No. CV-02-3320WJR, 2003 WL 22127029, at *3 (C.D. Cal. July 14, 2003) ("Since the [] lawsuit against Plaintiff Big 5 did not involve a covered 'loss' … Defendant Gulf is not required to assume responsibility for Plaintiff Big 5's defense costs.").

23

To avoid that risk, courts recognize as a matter of public policy that "an insured incurs no loss within the meaning of the insurance contract by being compelled to return property that it had stolen, even if a more polite word than 'stolen' is used to characterize the claim for the property's return." Op., R. 84, PageID# 5760 (quoting *Level 3*, 272 F.3d at 911). This "interpretive principle"—"that a 'loss' within the meaning of an insurance contract does not include the restoration of an ill-gotten gain—is clearly right." *Level 3*, 272 F.3d at 910; *accord* Allan D. Windt, 3 *Insurance Claims and Disputes* § 11:6 (6th ed. 2023) ("claims for restitution or disgorgement should not be covered").

*Level 3*'s "interpretive principle" reflects Ohio public policy in two key respects. First, the purpose of insurance is to indemnify the insured for a loss, not to provide a windfall. *See Roberts v. State Farm Mut. Auto. Ins. Co.*, 802 N.E.2d 157, 160 (Ohio Ct. App. 2003); *Fireman's Fund Ins. Co. v. Mitchell-Peterson, Inc.*, 578 N.E.2d 851, 859–60 (Ohio Ct. App. 1989). Permitting an insured to seek indemnification for the "loss" of money to which it was never legally entitled would constitute a quintessential windfall. Second, it is an immutable prerequisite to coverage that the insured must have an "insurable interest" in the

24

subject property. "If there is no interest there can be no loss. If there is no loss, there is nothing to indemnify. It is against public policy to insure for one's own benefit the property of another in which the first person has no interest." *Kungle v. Equitable Gen. Ins. Co.*, 500 N.E.2d 343, 348 (Ohio 1985); *accord* 3 *Couch on Insurance* § 41:3 (3d ed. 2022) ("An insurable interest must be a lawful, valid, and enforceable right or interest."). In other words, "[y]ou can't, at least for insurance purposes, sustain a 'loss' of something you don't (or shouldn't) have." *Ryerson Inc. v. Fed. Ins. Co.*, 676 F.3d 610, 613 (7th Cir. 2012). "No one writes such insurance … and no state would enforce such an insurance policy if it were written." *Id.*; *cf. Phillips v. Cincinnati Ins. Co.*, 398 N.E.2d 564, 566 (Ohio 1979) (reasoning, "on public policy grounds," that an insured can obtain an insurable interest in goods only as "an innocent, bona fide purchaser").

Accordingly, the Ohio federal district court in *Chubb Custom Insurance Company v. Grange Mutual Casualty Company* predicted that Ohio state courts would deem uninsurable "circumstances involving the insured being required to restore to the plaintiff that which was wrongfully acquired," while allowing insurance coverage for compensatory damage claims based on the unlawful *retention* of

property. No. 2:07-cv-1285, 2011 WL 4543896, at *11 (S.D. Ohio Sept. 29, 2011) (cleaned up). This Court in *William Beaumont Hosp. v. Federal Insurance Company*, 552 F. App'x 494 (6th Cir. 2014), embraced *Chubb*'s distinction between the wrongful *acquisition* of funds (which are not insurable losses) and the wrongful *retention* of funds (which might be insurable). The Court canvassed the relevant case law, including *Level 3* and its progeny, to hold that Michigan law did not preclude coverage for the insured's unlawful *withholding* of compensation from its employees because such claims do not constitute disgorgement and are not restitutionary in character. *Id.* at 498–500; *id.* at 499 ("Retaining or withholding differs from obtaining or acquiring.").

The Trustee's fraudulent transfer lawsuit against Huntington is uninsurable because it sought the return of wrongfully acquired, "ill-gotten" gains. Under the Bankruptcy Code, and as decided by this Court in the underlying bankruptcy action, Huntington had no legal right to receive the fraudulent transfers from Teleservices and Cyberco. *Meoli*, 848 F.3d at 724 n.2. As the Bankruptcy Court held, and this Court ultimately affirmed, Huntington wrongfully acquired at least $12,000,000 (before interest) of fraudulent transfers in the form of loan

26

repayments from Cyberco and Teleservices after April 2004, when Huntington could no longer claim "good faith" receipt of those payments. "[T]he unwinding of the situation by requiring the return of the money to the Trustee takes away from no one anything to which that person is entitled. Holding that the Trustee may recover simply places all the parties in the position where they were before the wrongful transfer took place." *Meoli*, 444 B.R. at 842 (quoting *IRS v. Nordic Village, Inc.*, 915 F.2d 1049, 1056 (6th Cir. 1990), *rev'd on other grounds, United States v. Nordic Village, Inc.*, 503 U.S. 30 (1992)). The disgorgement of those wrongfully acquired funds therefore is not an insurable loss.

The Fifth Circuit's decision in *In re TransTexas Gas Corp.*, 597 F.3d 298 (5th Cir. 2010), is squarely on point. In that case, a bankruptcy trustee for a Chapter 11 debtor sought to recover over $2 million in severance payments from the company's former CEO, alleging that the contractual payments constituted fraudulent transfers pursuant to Section 548 of the Bankruptcy Code. *Id.* at 303. The bankruptcy court, the district court, and the Fifth Circuit agreed and ordered the CEO to repay the unlawful severance payments. Critically, the panel also affirmed summary judgment for National Union on the basis that the

27

insured's claim for avoidable fraudulent transfers was uninsurable as a matter of law. *Id*. at 310–11.

The policy in *TransTexas* defined "Loss" such that it "shall not include … matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed." *Id*. at 309. The Fifth Circuit panel applied this "unambiguous" language to "hold that the return of funds due to a fraudulent transfer is in the nature of restitution" and therefore uninsurable under Texas law. The panel rejected the insured's attempt to distinguish *Level 3* on the basis that the former CEO "had a clear contractual right to the severance payments at the time he received them." *Id*. at 310. Regardless of any purported contractual entitlement to the funds, "[p]ayments fraudulent as to creditors that must therefore be repaid due to bankruptcy court order is a disgorgement of ill-gotten gains and a restitutionary payment" that is uninsurable despite constituting "a loss in the colloquial sense." *Id*. at 309–10.

The same principle governs here, as the district court below rightly held. Huntington's acquisition of fraudulently transferred assets from the insolvent entities was money to which Huntington was never entitled and whose return under the Bankruptcy Code is not an insurable loss.

**B.**     **Huntington's contrary arguments are meritless**

1.     In the district court, Huntington expressly acknowledged the governing legal rule set forth above, declaring that "Ohio law is clear that … wrongfully acquired funds are not insurable." Huntington Br., R. 71, PageID# 3150. On appeal, however, Huntington flips its position completely, arguing that "[t]he district court's conclusion that 'Ohio courts are unlikely to permit insurance coverage for wrongfully obtained money' was wrong on both the law (insurability) and the facts." Br. 31. Huntington cannot now complain that the district court supposedly erred by adopting the legal rule for which Huntington itself advocated. *Simms v. Bayer Healthcare LLC*, 752 F.3d 1065, 1072 (6th Cir. 2014) (invited error generally is not subject to review).

Nor is Huntington correct in claiming that "numerous courts" have "rejected" this well-established principle of insurance law. Br. 39. Huntington relies on eight cases (at 39–41), none of which are on point, and several of which support Insurers' position in this appeal:

- Three cases[6] applied *sui generis* Delaware law. As the district court below explained, "only claims specified by statute are uninsurable" under Delaware law, whereas "Ohio has no analogous rule." Op., R. 84, PageID# 5760; *see Sycamore*, 2021 WL 761639 at *11 (trial court opining that "in Delaware, losses are uninsurable as against public policy only if the legislature so provides").

- In *Astellas US Holding, Inc. v. Fed. Ins. Co.*, No. 21-3075, 2023 WL 3221737 (7th Cir. May 3, 2023), the Seventh Circuit embraced *Level 3* and its holding that Illinois "prohibits insurance coverage for losses incurred from settlement payments that are 'restitutionary in character.'" *Id.* at *5. At issue in *Astellas* was whether the underlying settlement resolved claims that were "compensatory" or "restitutionary." The analysis was complicated by the fact that the settlement was not preceded by any claim or lawsuit, and the court

---

[6] *Sycamore Partners Mgmt., L.P. v. Endurance Am. Ins. Co.*, No. N18C-09-211, 2021 WL 761639 (Del. Super. Ct. Feb. 26, 2021); *RSUI Indem. Co. v. Murdock*, 248 A.3d 887 (Del. 2021); and *U.S. Bank Nat'l Ass'n v. Indian Harbor Ins. Co.*, No. 12-cv-3175, 2014 WL 3012969 (D. Minn. July 3, 2014).

(unlike here) had no complaint or litigation that could "shed some light on the nature of a later settlement payment." *Id.* at *8. The court could not say definitively that potential claims under the False Claims Act, the Anti-Kickback Statute, and common-law fraud claims "are necessarily remedied via restitution rather than compensation." *Id.* at *14. By contrast, Huntington's settlement resolved causes of action brought under Sections 548 and 550 of the Bankruptcy Code to recover fraudulent transfers made to Huntington, and this Court already has affirmed Huntington's liability to disgorge millions of dollars in wrongfully acquired loan payments.[7]

- In *Burks v. XL Specialty Ins. Co.*, 534 S.W.3d 458 (Tex. App. 2015), the court held that summary judgment was precluded by "a genuine issue of material fact on whether Burks's settlement was for disgorgement and therefore 'uninsurable

---

[7] In a parallel state-court proceeding to *Astellas*, the Cook County Circuit Court declined to find the settlement uninsurable "as a matter of public policy for failure to comply with state statutes." Br., Add. B at 15. The court did not address, much less "reject" (Br. 40) the well-established principle that wrongfully acquired gains are uninsurable.

under the law' of Texas." *Id.* at 470. The court lamented that the "actual settlement agreement is not in the record," which hampered the court's independent analysis of the nature of the settlement. *Id.* at 468. The court specifically distinguished those facts from a case in which a "judgment ordering the repayment of a fraudulent transfer under the Bankruptcy Code may indicate that an insured has paid restitution or disgorgement." *Id.* at 467–68 (citing *TransTexas*, 597 F.3d at 310). Here, we have a judgment—which this Court affirmed in relevant part—ordering Huntington to disgorge the ill-gotten gains it received as fraudulent transfers from Cyberco and Teleservices.

- In *Call One Inc. v. Berkley Ins. Co.*, 587 F. Supp. 3d 706, 715 (N.D. Ill. 2022), the court began from the premise that "claims for disgorgement cannot be insured as a matter of public policy." As the court explained, "in cases where the plaintiff is seeking restitution of the defendant's improper gain imposing coverage would be asking insurance companies to pick up the tab for monies the insured should have never received in the

first place." *Id*. (cleaned up). That principle did not apply, however, because "the claims faced by Call One in the [Illinois False Claims Act] lawsuit were claims for compensatory relief, not disgorgement of profits. Accordingly, those claims were not uninsurable as a matter of Illinois law." *Id*. at 717. "Any damages sought by the OAG were not based on a determination of Call One's ill-gotten gains, as required for disgorgement, but tethered directly to the State's lost revenue." *Id*. at 716.

- In *In re TIAA-CREF Ins. Appeals*, 192 A.3d 554 (table), 2018 WL 3620873 (Del. 2018), the court acknowledged that "New York public policy prohibits enforcement of insurance agreements in cases involving disgorgement where the payment is conclusively linked, in some fashion, to improperly acquired funds in the hands of the insured." *Id*. at *2. Interpreting New York precedent at the time, the court concluded that the rule simply did not apply, however, because there was "[n]o finding" that TIAA had received any "ill-gotten gain." *Id*. The underlying lawsuit against the

33

insured involved the timing of investment trade processing, and it was undisputed that the insured "does not earn profit or incur loss" with respect to the allegedly wrongful acts. *Id.* at *1. As such, the "ill-gotten gains" test simply did not apply.

- Lastly, *J.P. Morgan Sec. Inc. v. Vigilant Ins. Co.*, 183 N.E.3d 443 (N.Y. 2021), supports appellees' position, not Huntington's. In that case, Bear Stearns settled with the SEC for $160 million over allegations of illegal trading practices. *Id.* at 445–46. $20 million of that settlement constituted Bear Stearns's own profits, measured by "revenues it received from clients in connection with its processing of the challenged trades." *Id.* at 446 n.3. Bear Stearns specifically "did not seek coverage" for the $20 million, *id.*, because—as all judges agreed—it constituted a "disgorgement" of "Bear Stearns's own ill-gotten gains," *id.* at 464 n.25 (Rivera, J., dissenting); *see id.* at 450 (maj. op.).[8] The narrow question left in the case, then, was whether the remaining $140 million settlement

---

[8] Bear Stearns's $20 million disgorgement is equivalent to Huntington's $32 million settlement in the Adversary Proceeding.

amount, made up of "third-party gains/injured investor losses," constituted "non-compensatory, purely punitive monetary sanctions" that could be excluded as a "penalty" under the insurance policy. *Id.* at 450. The majority opinion concluded that "the $140 million payment served a compensatory goal" and therefore was not precluded by law as an uninsurable penalty. *Id.* at 451.

Far from "rejecting" the ill-gotten gains rule, Huntington's cases embrace the well-established principle that the return of wrongfully acquired funds is an uninsurable loss.

2.    Contrary to Huntington's arguments that rely on canons of *contra proferentem* (at 41), the legal question of insurability under Ohio law is not a matter of contractual "interpretation." The phrase "uninsurable under the law" is unambiguous. *TransTexas*, 597 F.3d at 309; *Strategic Cap. Bancorp, Inc. v. St. Paul Mercury Ins. Co.*, No. 10-CV-2062, 2015 WL 13598261, at *7 (C.D. Ill. Sept. 25, 2015) (collecting cases). Unlike other insurance disputes, this case does not involve competing interpretations of the meaning of a disputed word or phrase. The question

on appeal is about the content of Ohio law—not the interpretation of Policy text—rendering canons of *contra proferentem* inapplicable.[9]

Similarly unavailing are Huntington's related "interpretive" arguments. Br. 35–37. The word "uninsurable" cannot be "limited to claims stemming from a fine or penalty, or punitive damages," as Huntington argues (at 35), without rendering superfluous the word "uninsurable" or deleting it altogether. The definition of "Loss" expressly does not include "fines" and "penalties," and it expressly "include[s] awards of punitive or exemplary damages." Endorsement 8, R. 70-6, PageID# 2840. Notably, the key clause at issue here—that Loss "shall not include matters deemed uninsurable under the law," *id.*—is introduced with a disjunctive "or," requiring the Court to give this phrase meaning that is independent of and additive to the adjacent text describing "fines" and "penalties."

---

[9] As such, Huntington's repeated citations to *Andersen v. Highland House Co.*, 757 N.E.2d 329 (Ohio 2001), miss the mark. *Andersen* found the word "pollutant" to be "ambiguous and therefore should be interpreted in favor of the insured." *Id.* at 334. This Court has repeatedly cautioned that *Andersen* is inapplicable when the policy text is "unambiguous." *St. Marys Foundry, Inc. v. Emps. Ins. of Wausau*, 332 F.3d 989, 996–97 (6th Cir. 2003); *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 137 (6th Cir. 2004); *Dana Inc. v. Zurich Am. Ins. Co.*, No. 21-4150, 2022 WL 2452381, at *4 (6th Cir. July 6, 2022).

Nor does any principle of contract law require an insurance contract to specify *in hac verba* the entire universe of matters that are considered uninsurable, such as "disgorgement" or "bankruptcy fraudulent transfers." Br. 36. The Policy's definition of "Loss" unambiguously "shall not include" matters that are "deemed uninsurable under the law." Policy § 2(g)(iv) (as amended by Endorsement 8), R. 70-6, PageID# 2814, 2840.[10] Such catchall provisions are an efficient and administrable means to identify the scope of coverage. *See AKC, Inc. v. United Specialty Ins. Co.*, 187 N.E.3d 501, 504 (Ohio 2021) ("a court cannot create ambiguity in a contract where there is none … by asking whether the parties could have included different or more express language in their agreement." (cleaned up)).[11]

---

[10] As Huntington points out (at 37), the Policy extends coverage to a claim against the insured's "estates, heirs, or legal representatives" in the event of the insured's "bankruptcy." Policy § 3, PageID# 2816. But this unrelated reference to "bankruptcy" elsewhere in the Policy has no bearing on the meaning of Endorsement 8, much less a limiting effect on the scope of the unambiguous definition of "Loss." The "uninsurable" clause in the "Loss" definition is not limited to bankruptcy actions; this case just happens to involve disgorgement alleged in a bankruptcy Adversary Proceeding.

[11] Where, as here, a policy term is unambiguous, extrinsic evidence of custom and usage and expert testimony play no role in contract

Footnote continued on next page

3.    As for Ohio law, Huntington argues that Ohio public policy deems uninsurable only claims involving "punishment" for "malicious acts," and Huntington maintains that it did nothing "wrongful." Br. 31–34. This is an incomplete description of the governing law and an inaccurate description of Huntington's own conduct in this matter.

For its legal rule, Huntington relies principally on the Ohio Court of Appeals' decision in *The Corinthian v. Hartford Fire Ins. Co.*, 758 N.E.2d 218 (Ohio Ct. App. 2001). That case did not declare, as Huntington argues (at 31), that *all* insurability determinations turn on whether the loss "was imposed as a punishment or to deter malicious acts." Rather, *The Corinthian* addressed the narrow question whether public policy precluded insurability of punitive damages under a specific Illinois statute that allowed punitive damages to be "awarded to a

---

interpretation. *See, e.g.*, *Sunoco, Inc. (R&M) v. Toledo Edison Co.*, 953 N.E.2d 285, 294, 297–98 (Ohio 2011). The salient question is a legal one: whether Huntington's repayment of the fraudulent transfers is an uninsurable "loss." But even if the Court were to consider custom and industry practice, the answer is the same. *See* Expert Report of Diane Parker, R. 73-4, PageID# 4308 ("The uninsurability of disgorgement – that is, being required to repay amounts to which an insured was not entitled – is a common coverage defense in claims involving such issues. … [I]f an insured returns something that it was not entitled to receive, then the insured has not incurred a 'loss.'"); Expert Report of Frederick Fisher, R. 73-5, PageID# 4413 (similar).

nursing home resident upon a showing that the resident received inappropriate or inadequate medical treatment or nursing care, without a showing of intent, malice, willfulness, or recklessness." *The Corinthian*, 758 N.E.2d at 220. The court's holding was limited to that narrow question of statutory interpretation in the context of a punitive damage claim, which the underlying policy expressly covered. *The Corinthian* did not reference—much less distinguish—any of the precedents noted above regarding the insurability of ill-gotten gains.[12]

While many insurance disputes involve an element of wrongful conduct, the ill-gotten gains rule is not so limited. It extends to circumstances where the insured "restor[es] to its rightful owners that which the insured, having no right thereto, has *inadvertently* acquired." *TransTexas*, 597 F.3d at 310 (emphasis added) (quoting *Nortex Oil & Gas Corp. v. Harbor Ins. Co.*, 456 S.W.2d 489, 494 (Tex. App. 1970)); *accord Ryerson*, 676 F.3d at 613 (restitution may be based on "an innocent

---

[12] Huntington's other authorities (at 32) likewise involve the insurability of punitive damages, which is a distinct inquiry from whether disgorgement "losses" are uninsurable. Thus, even if "disgorgement is not a punitive remedy," as Huntington argues (at 31), that characterization does not inform whether Ohio law *also* precludes the insurability of disgorged ill-gotten gains.

mistake"). Here, this Court found that Huntington lacked "good faith" in accepting the fraudulent transfers. But even setting aside that finding, "Courts have generally found that if an insured wrongfully acquires funds and then is forced to return the funds, or if an insured is held liable to pay its corporate obligations incurred in the ordinary course of business, it has not suffered a loss, *regardless of whether the wrongful conduct was intentional." Conseco, Inc. v. Nat'l Union Fire Ins. Co.*, 2002 WL 31961447, *11 (Ind. Cir. Dec. 31, 2002) (emphasis added).

Alternatively, Huntington maintains that it neither "acquired" anything from Cyberco and Teleservices nor engaged in any "wrongful" conduct. Both premises are false. First, this Court specifically held in the underlying Adversary Proceeding that Huntington was liable only for the funds over which it had "gained dominion and control," removing any doubt that Huntington "acquired" the fraudulently transferred funds. *Meoli*, 848 F.3d at 720–29. Indeed, the bankruptcy court and this Court performed a "temporal analysis" that looked specifically to Huntington's lack of good faith at the time Huntington *received* the fraudulent transfers. 444 B.R. at 815–16; *see Meoli*, 848 F.3d at 730. Huntington's contention that it could lawfully accept the loan payments from Cyberco

40

and Teleservices at the time they were acquired was rejected in the underlying litigation. 444 B.R. at 830.

Huntington thus misplaces its reliance on cases that distinguish between wrongly *acquired* funds and wrongfully *retained* funds. As those cases explain, an insured "retains" money when it "mak[es] lower payments" than it was legally required to make, leading to an award of *compensatory* damages rather than restitution. *William Beaumont Hosp.*, 552 F. App'x at 499. Unlike *Chubb*, where the insured wrongfully "saved" money by withholding payments that should have been distributed to its customers, 2011 WL 4543896, at *11, Huntington unlawfully *acquired* fraudulent transfers from its customer. It was Huntington's receipt of those funds without good faith that established Huntington's liability under 11 U.S.C. §§ 548 and 550, not Huntington's subsequent *retention* of the money thereafter.

As for Huntington's conduct, the Adversary Proceedings indisputably focused on Huntington's culpability, not simply Cyberco's fraud. *See* 444 B.R. at 816 ("it is only Huntington's own behavior that is under scrutiny"); *id.* at 803 ("when an inherently vicious act like an actually fraudulent transfer is involved, then whether the recipient knew

41

of the fraud or not becomes crucial, for that knowledge reflects his own honesty and integrity—i.e., his good faith"). Contrary to Huntington's characterization (at 20), this Court did not affirm the fraudulent transfer judgment based on "inquiry notice" alone. Quite the contrary: this Court *reversed* the portion of the judgment predicated solely on "inquiry notice" with respect to indirect transfers and affirmed the fraudulent transfer findings based on Huntington's lack of "good faith." *Meoli*, 848 F.3d at 732. Because "a corporation cannot feign ignorance" when it is worried it may "lose money" and has "already spotted many 'red flags,'" this Court held that "Huntington's proof of good faith ended" at least as early as "April 30, 2004." *Id*. at 730–31.

4.    Finally, Huntington complains that the district court improperly "flip[ped] the burden of proof" and imposed it on Huntington with respect to the definition of "Loss." Br. 38. This argument is doubly wrong. First, the district court explicitly and emphatically placed the burden on Insurers by concluding that the "uninsurability" limitation was an exclusion, rather than a condition, to coverage—despite Insurers'

42

arguments to the contrary. Op., R. 84, PageID# 5759.[13] Huntington identifies nothing in the opinion below to suggest that the district court did not then hold Insurers to the burden. Instead, Huntington seems to object (at 41) that the district court was more persuaded by Insurers' legal authority and arguments than Huntington's.

Second, and in any event, the burden should have rested with Huntington to establish coverage for an insurable Loss. Under Ohio law, the insured bears the initial burden of proof to establish that a policy provides coverage for a particular loss. *Will Repair, Inc. v. Grange Ins. Co.*, 15 N.E.3d 386, 391 (Ohio Ct. App. 2014). Only after the insured meets its burden to establish coverage does the burden then shift to the insurer to prove the applicability of an exclusion. *Continental Ins. Co. v. Louis Marx & Co.*, Inc., 415 N.E.2d 315, 317 (Ohio 1980). That ordering flows from the "basic principle" of insurance that "exclusion clauses *subtract* from coverage." *State Auto. Mut. Ins. Co. v. Fairfield Homes, Inc.*, No. 11-CA-89, 1989 WL 139822, at *3 (Ohio Ct. App. Nov. 14, 1989).

---

[13] Because Insurers ultimately prevailed below, they had no basis to "cross-appeal" (Br. 29) the district court's ruling on this issue. *Jennings v. Stephens*, 574 U.S. 271, 276 (2015).

Here, the district court incorrectly held that the definition of "Loss," which does "not include … matters deemed uninsurable under the law," was an exclusion from coverage. But proof of an insured loss is a necessary initial step in *establishing* coverage, and that does not change simply because the definition of "Loss" includes limitations. That rule is especially compelling when, as here, the salient coverage limitation refers to a limitation imposed by law rather than by mutual agreement of the parties (i.e., "Loss … shall not include matters deemed uninsurable *under the law*."). Parties simply cannot agree to insure that which is "uninsurable under the law." *See Ryerson*, 676 F.3d at 613. Therefore, the "uninsurable" clause in the definition of Loss does not constitute an exclusion because it cannot subtract from coverage those matters that the law deems "uninsurable" in the first place. The burden of establishing an insurable loss is an antecedent showing that falls on the insured. *See TransTexas*, 597 F.3d at 311 ("U.S. Bank bore the burden of proof that its claim was covered by the policy. U.S. Bank did not meet that burden.").

44

\*    \*    \*

As Huntington acknowledged in the district court, "Ohio law is clear that … wrongfully acquired funds are not insurable." Huntington Br., R. 71, PageID# 3150. That concession was well-founded and aligns Ohio with the consensus of authority that the disgorgement of ill-gotten gains are uninsurable as a matter of public policy. And as Huntington also acknowledged last time it litigated this matter in this Court, "[i]t is 'well-established' that 'fraudulent transfer recovery is a form of disgorgement.'" Opening Brief for The Huntington National Bank, Nos. 15-2308/2362 (6th Cir. Jan. 28, 2016), ECF No. 22 at 36 (quoting *Freeland v. Enodis Corp.*, 540 F.3d 721, 740 (7th Cir. 2008)). Huntington had it right the first time. Its return of fraudulently transferred funds to the bankruptcy estate is uninsurable as a matter of law, and this Court should affirm the decision below.

## II.    Huntington's Settlement Is Independently Excluded from Coverage as an "Unrecoverable or Outstanding Credit"

Even if Huntington could establish an insurable Loss, Huntington's settlement falls squarely within the exclusion for losses "in connection with any Claim" made against Huntington "for the principal and/or interest of any unrepaid, unrecoverable or outstanding credit."

45

Endorsement 7, R. 70-6, PageID# 2838. As such, the Policy here does not cover Huntington's settlement or defense costs. *See* 9A *Couch on Insurance* § 129:1.

1.    Endorsement 7 applies to Huntington's "Lending Acts." A "Lending Act" is broadly defined as "any act performed by an Insured for … a customer or client of the Company relating to an extension of credit, a refusal to extend credit or an agreement to extend credit." Endorsement 7(m), R. 70-6, PageID# 2837. The district court held that Endorsement 7 applies because Huntington was engaged in Lending Acts when it "extended to Cyberco … a line of credit," and then "accepted payments … to pay down that line of credit." Op., R. 84, PageID# 5765. Huntington does not contest this conclusion in its opening brief.

The underlying settlement payment also was made "in connection with [a] Claim" against Huntington "for the principal and/or interest of any unrepaid, unrecoverable or outstanding credit." Endorsement 7, R. 70-6, PageID# 2838. In the bankruptcy proceedings, the Trustee sought to recover from Huntington fraudulent transfers used to "repay [Cyberco's] debt to Huntington." *Meoli*, 848 F.3d at 719. This Court held that the Trustee "may recover from Huntington" all direct and indirect

46

loan repayments Huntington received after April 30, 2004, and any "indirect loan repayments … Huntington received earlier, if the district court conclude[d] on remand that Huntington gained knowledge of the voidability of the transfers before April 30, 2004," plus prejudgment interest. *Id.* at 735–36. These "avoidance" orders would "unwind" or "roll back" Cyberco's "pre-bankruptcy transfers." *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1663 (2019); *Nordic Village*, 915 F.2d at 1056 ("unwinding" fraudulent bank transfers under the Bankruptcy Code "simply places all the parties in the position where they were before the wrongful transfer took place").

The fundamental premise—and ultimate holding—of the underlying Adversary Proceeding was that the loan payments to Huntington were fraudulent transfers that Huntington was never legally entitled to receive or retain. Both in theory and practice, Huntington's loan to Cyberco was an "unrecoverable or outstanding credit" as of April 30, 2004 (and perhaps earlier). Endorsement 7, R. 70-6, PageID# 2838. In contending that Cyberco already had "fully repaid" Huntington's loan (Br. 45–46), Huntington ignores both the nature of the Adversary Proceeding and that its insurance claim is based on the bankruptcy

47

court's *subsequent* order (affirmed by this Court in *Meoli*) to unwind those fraudulent payments to return all parties to the *status quo ante*.

Huntington attempts to rewrite the Lending Act exclusion (at 45–46) by myopically focusing on the term "unrepaid" and deleting the other terms in Endorsement 7 relating to "unrecoverable" or "outstanding" credit. Failing to give effect to those words violates the cardinal rule that courts must give meaning to all provisions in a contract, which is interpreted "as a whole, and not from detached or isolated parts." *Sauer v. Crews*, 18 N.E.3d 410, 413 (Ohio. 2014) (cleaned up); *see also Wohl v. Swinney*, 888 N.E.2d 1062, 1066 (Ohio 2008). Regardless whether Cyberco's loan balance was previously repaid (albeit fraudulently), Huntington never explains why those payments disgorged through settlement are not *presently* "unrecoverable or outstanding."

Huntington tries (at 49) to focus attention on the "$19 million in Excess Deposits" that it contends were at issue on remand, speculating that *maybe* the settlement could have encompassed those amounts, rather than the unrecoverable or outstanding credit. But this Court already had held in the underlying action that the Trustee "cannot recover Cyberco's excess deposits." *Meoli*, 848 F.3d at 724, 736. Those

48

deposits thus could not realistically have driven the parties' settlement on remand. *See* Ex. 1, R. 572-1, PageID# 2, *Meoli v. Huntington Nat'l Bank*, No. 7-80037 (W.D. Mich. Aug. 25, 2017); Op., R. 84, PageID# 5763 (district court below characterizing Huntington's speculation as "patently false").

2.    Because Endorsement 7's exclusion for "unrepaid, unrecoverable or outstanding credit" is unambiguous, a court may "look no further than the writing itself to determine the parties' intent." *Motorists Mut. Ins. Co. v. Ironics, Inc.*, 200 N.E.3d 149, 155 (Ohio 2022). The district court thus rightly declined Huntington's invitation (at 50–52) to consider "[e]xtrinsic evidence of industry custom and usage."

Endorsement 7 is not ambiguous. "Contract language is not ambiguous merely because the parties interpret it differently." *Duncan v. Muzyn*, 885 F.3d 422, 425 (6th Cir. 2018). An "ambiguity exists only when a provision at issue is susceptible of more than one reasonable interpretation." *Eastham v. Chesapeake Appalachia, L.L.C.*, 754 F.3d 356, 361 (6th Cir. 2014) (cleaned up) (quoting *Lager v. Miller-Gonzalez*, 896 N.E.2d 666, 669 (Ohio 2008)). And "courts may not use extrinsic evidence to create an ambiguity; rather, the ambiguity must be patent,

49

i.e., apparent on the face of the contract." *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763 (6th Cir. 2008) (quoting *Covington v. Lucia*, 784 N.E.2d 186, 190 (Ohio Ct. App. 2003)). "Otherwise, allegations of ambiguity become self-fulfilling." *Eastham*, 754 F.3d at 361 (quoting *State v. Porterfield*, 829 N.E.2d 690, 692–93 (Ohio 2005)).

Huntington has not offered any reasonable contrary interpretation of the words "unrecoverable or outstanding credit" that would render Endorsement 7 inapplicable to Huntington's settlement with the Trustee. Instead, Huntington relies on extrinsic evidence to dispute the exclusion's meaning, but that approach improperly puts the cart before the horse.

In any event, the interpretations offered by Huntington's experts cannot be squared with the Policy text. First, Huntington maintains (at 22, 50–51) that the "Endorsement 7 exclusion applies only to claims relating to the 'front end' (origination) and the 'back end' (foreclosure) of the loan process"—and nothing in "the 'middle' of the lending process (such as the receipt of credit-line repayments cited by the district court)." However, Huntington identifies no textual basis in Endorsement 7 for its position. That interpretation also would lead to absurd results: a bank

could willfully facilitate fraudulent transfers and reap the benefits so long as those transfers occur somewhere between the beginning and the end of a loan. But that notion contradicts the broad definition of "Lending Act," which covers "any act … relating to an extension of credit." Endorsement 7, R. 70-6, PageID# 2837.

Second, Huntington wrongly argues (at 51–52) based on expert opinion that Endorsement 7 excludes coverage only when a borrower accuses Huntington of causing it to default on a loan or miss payments. But that interpretation cannot be reconciled with the text of Endorsement 7. After setting forth the exclusion for "unrepaid, unrecoverable or outstanding credit," Endorsement 7 provides that the exclusion "shall not apply" if "the Insured is legally accountable for a borrower's financial losses relating, directly or indirectly, to actions taken by the Insured with respect to such extension of credit." Endorsement 7, R. 70-6, PageID# 2838. In other words, Endorsement 7 reintroduces coverage for the exact claim that Huntington contends is excluded. Because an exclusion must necessarily be broader than its exception, Huntington's interpretation is not reasonable.

The district court correctly declined to credit Huntington's extrinsic evidence "because the exclusion is unambiguous." Op., R. 84, PageID# 5765 n.6. Huntington has failed to establish any error in that holding on appeal.

3.    Again, the district court did not "flip[] the burden of proof" (Br. 48–49) to require Huntington to show that the underlying settlement does not fall within Endorsement 7's exclusion for "unrepaid, unrecoverable or outstanding credit." R. 70-6, PageID# 2838. Nothing in the district court's analysis suggests that it shifted the burden to Huntington, and Huntington identifies no statement to that effect. *See* Br. 48–50.

Nor did the district court remotely rely on a "presumption regarding the intent of Endorsement 7." Br. 48–49. Huntington's argument is premised on a partial quote from Insurers' briefing below, not the district court's decision. Insurers argued that, because "all terms of an insurance contract 'are to be read in their entirety … and each word given its appropriate meaning,' … it must be presumed that it was the intent of the parties to exclude claims for either outstanding or unrecoverable credit." Br., R. 70, PageID# 2556–57 (emphasis omitted). That position

52

accurately restates the law: "The intent of the parties is presumed to reside in the language they choose to use in their agreement." *Savedoff*, 524 F.3d at 763 (quoting *Graham v. Drydock Coal Co.*, 667 N.E.2d 949, 952 (Ohio 1996)); *accord Beverage Holdings, L.L.C. v. 5701 Lombardo, L.L.C.*, 150 N.E.3d 28, 31 (Ohio 2019).

The district court properly applied the plain text of the exclusion in Endorsement 7 to the uncontested facts in the underlying Adversary Proceeding and subsequent settlement. After this Court in *Meoli* held that Cyberco's and Teleservices' loan payments to Huntington after April 2004 constituted fraudulent transfers, those payments immediately became "unrecoverable or outstanding credit" as a matter of law. Because Huntington's purported loss arises "in connection" with that lawsuit, Endorsement 7 excludes coverage in this case.

## III. The "Larger Settlement Rule" Does Not Apply

As a last-ditch effort, Huntington contends that *even if* the fraudulent transfer claim against it is uninsurable as a matter of law or excluded under Endorsement 7, it should nevertheless be indemnified for the entire settlement amount under the "larger settlement rule." Br. 52–56. But Huntington misstates the rule and the circumstances under

53

which it applies. According to Huntington, the rule dictates that if a "settlement is even partially attributable to [any] covered claims, the insurer must cover the whole settlement." Br. 52. Huntington is mistaken.

In the absence of policy language governing the allocation of settlements, the larger settlement rule provides that an insurer may be required to cover all of a settlement that includes covered losses *unless* the "settlement is larger because of the activities of uninsured persons who were sued," *Owens Corning v. Nat'l Union Fire Ins. Co.*, 257 F.3d 484, 491 (6th Cir. 2001) (quoting *Caterpillar, Inc. v. Great Am. Ins. Co.*, 62 F.3d 955, 960 (7th Cir. 1995)), in which case the court must "allocat[e] … the costs of a settlement" to account for the difference. *Id.* For instance, "if [an] uninsured corporate defendant made the settlement larger than it otherwise would have been with only the insured directors as defendants, allocation of the excess can be made and coverage *partially denied*." *Id.* (emphasis added). In those circumstances, "the insurer will not be responsible for reimbursing the cost of the entire settlement." *Nat'l Union Fire Ins. Co. v. Am. Motorists Ins. Co.*, 707 F.3d 797, 801 (7th Cir. 2013).

54

The larger settlement rule does not apply here. *Owens Corning* and the other cases cited by Huntington (at 52) applied the larger settlement rule to the allocation of loss between covered and noncovered *parties*—not the allocation of loss between covered versus noncovered theories of liability. *Owens Corning*, 257 F.3d at 492; *Nat'l Union*, 707 F.3d at 801; *Caterpillar*, 62 F.3d at 960, 964. "The link between increased settlement costs because of an uncovered party is not the same as the link between increased settlement costs because of an uncovered claim." *In re C.M. Meiers Co., Inc.*, No. 1:12-BK-10229, 2016 WL 9458553, at *30 (Bankr. C.D. Cal. Dec. 20, 2016), *adopted*, 2017 WL 2927296 (C.D. Cal. July 6, 2017), *aff'd sub nom. Sharp, Tr. of Est. of C.M. Meiers Co., Inc. v. Evanston Ins. Co.*, 817 F. App'x 317 (9th Cir. 2020).

But even if this Court were to extend *Owens Corning* to the allocation of a settlement between theories of liability, the rule still would not apply here because Huntington cannot establish that the settlement involved *any* covered claim.

Huntington contends (at 54) that the Trustee pursued a "claim on remand for $19 million in Excess Deposits plus tens of millions in related prejudgment interest." But Huntington never explains why this theory of

liability, which likewise seeks disgorgement of alleged ill-gotten gains, would be covered by the Policy in light of Parts I and II above. In any event, that theory would have been precluded by this Court's prior holding in the Adversary Proceeding that the Trustee "cannot recover [the] excess deposits" because Huntington lacked the requisite dominion and control over the Excess Deposits to become a "transferee" under the Bankruptcy Code. *Meoli*, 848 F.3d at 724, 736 ("[W]e hold that Huntington is not liable for those excess deposits."). The Trustee could only recover on remand the direct and indirect loan payments made to Huntington as fraudulent transfers. *Id.* at 735.

On remand, Huntington thus acknowledged its liability for the direct and indirect loan payments, asking that "final judgment be entered in the amount of $12,821,897.07 (plus interest)," which Huntington asserted was "the total amount of direct and indirect repayments Huntington received after April 30, 2004." Huntington Br., R. 70-1, PageID# 2571; *see also id.*, PageID# 2579 & n.4. In contrast, the Trustee sought *all* direct and indirect loan payments after September 25, 2003, which totaled "nearly $36 million." Tr. Br., R. 70-2, PageID# 2640; *see also id.*, PageID# 2613, 2631–32; Ex. 1, R. 572-1, PageID# 2, *Meoli v.*

*Huntington Nat'l Bank*, No. 7-80037 (W.D. Mich. Aug. 25, 2017). The parties ultimately settled for $32 million, reflecting a compromise between the parties' respective calculations.

Huntington's argument that the larger settlement rule requires coverage for the entire settlement also defies economic sense. Huntington contends (at 54, without a record citation) that "the evidence demonstrates" that "the settlement was not increased by the uncovered claims" relating to the direct and indirect loan payments. For that to be correct, the parties would have had to allocate exactly $0 to a judgment (affirmed by this Court on appeal) awarding the Trustee over $12 million plus interest—liability that Huntington *admitted* on remand (supra, p. 56). It is implausible to maintain, as Huntington does (at 54), that an admitted liability exceeding $12 million did not "increase" the settlement amount. Moreover, Huntington's position rests on the equally untenable premise that Huntington agreed to pay $32 million for potential Excess Deposit theories of recovery that the Sixth Circuit *already had rejected* as a matter of law. As the district court below recognized, Huntington's position is "patently false," Op., R. 84, PageID# 5763, and economically irrational.

For the reasons set forth in Parts I and II above, the Policy does not provide coverage for Huntington's defense and settlement of the underlying Adversary Proceeding. The larger settlement rule does not change that fact simply because Huntington speculates—without record support—that it *might* have been motivated to settle an unspecified covered claim. The larger settlement rule does not apply here.

## CONCLUSION

Appellees respectfully ask the Court to affirm the decision below.

Dated: May 22, 2023                    Respectfully submitted,

                                       */s/ R. Reeves Anderson*
                                       Robert Reeves Anderson
                                       Suneeta Hazra
                                       Rachel Ryan
                                       ARNOLD & PORTER
                                          KAYE SCHOLER LLP
                                       1144 Fifteenth Street, Suite 3100
                                       Denver, CO 80202
                                       (303) 863-2325
                                       reeves.anderson@arnoldporter.com

                                       Devin M. Adams
                                       ARNOLD & PORTER
                                          KAYE SCHOLER LLP
                                       700 Louisiana Street, Suite 4000
                                       Houston, TX 77002-2755
                                       (713) 576-2444
                                       devin.adams@arnoldporter.com

                                       *Counsel for Appellees*

58

## COMBINED CERTIFICATIONS

1.     I certify that the foregoing brief complies with Federal Rule of Appellate Procedure 32(a)(7), because the body of the brief is 11,651 words. I further certify that this brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6), respectively, because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

2.     I certify that on May 22, 2023, I electronically filed the foregoing document with the United States Court of Appeals for the Sixth Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users.

Dated: May 22, 2023                    */s/ R. Reeves Anderson*
                                       Robert Reeves Anderson

**ADDENDUM**

**DESIGNATION OF RELEVANT
DISTRICT COURT DOCUMENTS**

| Dkt. No. | Description of Document | PageID |
|:---:|:---:|:---:|
| 1 | Huntington's Complaint | 1–18 |
| 1-3 | Insurer's Letters (April 2007, May 2013, and August 2018) Reserving Rights and Denying Coverage | 97–112 |
| 18-1 | Cyberco Complaint (Adversary Proceeding) | 207–263 |
| 18-2 | Teleservices Complaint (Adversary Proceeding) | 264–271 |
| 18-3 | Huntington's March 2007 Request for "Review and Coverage Analysis" | 272–274 |
| 70 | AIG Specialty's and National Union's Motion for Summary Judgment | 2518–2563 |
| 70-1 | Huntington's Opening Brief on Remand | 2564-2605 |
| 70-2 | Trustee's Brief on Remand | 2606-2644 |
| 70-6 | Huntington's 2007-2008 Professional Liability Insurance Policy | 2808–2863 |
| 70-7 | Huntington's 2007-2008 Excess Liability Policy | 2864–2882 |
| 70-11 | Travelers' Letter to Huntington dated June 14, 2013 | 2977–2982 |
| 70-12 | Travelers' Letter to Huntington dated February 8, 2018 | 2986–2989 |

| 71 | Huntington's Motion For Partial Summary Judgment | 3111–3167 |
|---|---|---|
| 73-4 | Expert Report of Diane M. Parker | 4284–4388 |
| 73-5 | Expert Report of Frederick J. Fisher | 4389–4438 |
| 84 | District Court Opinion and Order | 5748–5767 |
| 85 | District Court Judgment | 5768 |
| 86 | Notice of Appeal | 5769–5771 |